LAW OFFICES OF GEORGE N. PROIOS, PLLC
George N. Proios (GP-9331)
Herald Square Building
1350 Broadway, Suite 1507
New York, NY  10018-7702
(212) 279-8880
Facsimile (212) 279-0670

Attorneys for Defendant Bunker Holdings Ltd

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
NEW YORK

------------------------------------------------------x
                                                    :
AQUAVITA INTERNATIONAL, S.A.
                                                    :      Civil Action No.
        Plaintiff,                                         1:08-cv-05878-UA
                                                    :
        v.
                                                    :
BUNKER HOLDINGS, LTD.,
                                                    :
------------------------------------------------------x

**BUNKER HOLDINGS, LTD.**
**MOTION AND SUPPORTING MEMORANDUM**
**TO DISMISS,  OR IN THE ALTERNATIVE TO**
**REDUCE SUPPLEMENTAL RULE B**
**MARITIME ATTACHMENT AMOUNT, FOR COUNTER-SECURITY**
**AND TO STAY ALL PROCEEDINGS FOR ARBITRATION**

**REQUEST FOR PROMPT HEARING PURSUANT TO**
**SUPPLEMENTAL RULE E(4) AND LOCAL ADMIRALTY RULE E.1**

        Defendant Bunker Holdings Ltd. moves pursuant to Federal Supplemental Admiralty

Rules B and E for this Court to dismiss the complaint and vacate the maritime garnishments and

attachments made or to be made in the case, or alternatively, for this Court to reduce the amount

garnished and attached as security in this case.

        If this Court does not dismiss the case, this Court further should stay this case now

including, all garnishment and attachment proceedings, first until Aquavita posts security for

Bunker Holdings' counterclaim,[1] and then for arbitration.

Bunker Holdings pursuant to Supplemental Admiralty Rule E(4) and Local Admiralty Rule1[2] requests  a prompt adversary hearing on this motion.

This Court explained in *Mediterranea Di Navigazione Spa v. Int'l Petrochemical Group S.A.*, 2007 U.S. Dist. LEXIS 35869, 2007 A.M.C. 1748 (S.D.N.Y. 2007):

> In order to obtain an attachment, apart from satisfying the filing and service requirements of Rules B and E, the plaintiff bears the burden of showing that "1) it has a valid *prima facie* admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 2006 AMC 1872, 1884-85, 460 F.3d 434, 445 (2 Cir. 2006); *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 2006 AMC 2744, 2006 WL 3019558, at *2 (S.D.N.Y. 2006). The Court must vacate an attachment if the plaintiff fails to sustain its burden of demonstrating that the requirements of Rules B and E are satisfied. *Aqua Stoli*, 2006 AMC at 1885, 460 F.3d at 445.

### I.    This Court Should Dismiss the Attachment and the Case

### A.    There is No Ripe Indemnity Claim By Aquavita Against Bunker Holdings

The parties agree that English law (Complaint, para. 11) governs the contract.

Under English law, there is no claim in indemnity for contingent liabilities.

Supplemental Rule B requires that there be a "*prima facie* admiralty claim."  Aquavita here only asserts a contingent liability.  This Court, as did this Court in *Sonito Shipping Co. v. Sun*

---

[1]  Bunker Holdings contemporaneously with this Motion and Memorandum, has filed its claim to the garnished funds, answered the complaint and counterclaimed against Aquavita. Federal Supplemental Admiralty Rule  E(7)(a) ("Security on Counterclaim") requires the immediate stay of this action until Aquavita posts security for Bunker Holdings' counterclaim.

[2]  Local Admiralty Rule E.1. Adversary Hearing Following Arrest, Attachment or Garnishment: "The adversary hearing following arrest or attachment or garnishment that is called for in Supplemental Rule E(4)(f) shall be conducted by a judicial officer within three court days, unless otherwise ordered."

*Maritime Ltd.*, 478 F. Supp. 2d 532 (S.D.N.Y. 2007)(Judge Haight)[3] now should vacate the Rule B attachment and dismiss the case. *Accord*, *Bottiglieri Di Na Vigazione SPA v. Tradeline LLC*, 472 F. Supp. 2d 588 (S.D.N.Y. 2007)(vacating Rule B attachment, English law, indemnity claim against unproven, potential arbitration award).

This case is directly related to *Farenco Shipping Co. LTD v. Aquavita International S.A.*, 1:08-cv-04882-WHP (Judge Pauley), now pending in this Court (Exhibit A hereto).

The gist of both this case - and No. 08-cv-04882 - is that Farenco Shipping owned the vessel M/V JIN XING ("Vessel"). Farenco chartered the Vessel to Aquavita. Aquavita bought fuel (bunkers) for the Vessel from Bunker Holdings. Bunker Holdings fueled the Vessel. Farenco insists that the bunkers damaged the Vessel. Farenco brought 08-cv-04882 to obtain security for its claims against Aquavita. Farenco intends to bring these claims according to English law in London arbitration (Farenco complaint, Exh. A hereto, para. 7).

There has, however, been no arbitration by Farenco against Aquavita. Most importantly, there has been no final arbitral award. There has been no final judgment of any kind against Aquavita. Aquavita disputes Farenco's claims.

Nevertheless, what Aquavita attempts to do in this case (against Bunker Holdings) is to assert against Bunker Holdings all of the damages, that Farenco claims from Aquavita. That is, this is an indemnity action by Aquavita against Bunker Holdings, in which, Aquavita has paid nothing and therefore no indemnity is due.

As this Court decided in *Sonito Shipping Co.* , however, there is no *prima facie* admiralty

---

[3]    Plaintiff Aquavita's counsel here, was defendant's counsel in the *Sun Maritime Ltd.* case and there, argued successfully the point that under English law, there is no ripe cause of action in indemnity, for contingent liabilities.

claim here because Aquavita has paid nothing to Farenco and therefore, under the controlling

English law, Aquavita has no cause of action in indemnity against Bunker Holdings.  This Court

for this first reason should vacate the Rule B garnishments and dismiss the case.

**B.      Aquavita Has Failed to Follow the Parties' Binding, Contractual Procedure for Claims Resolution**

This Court also should vacate the Rule B garnishments and dismiss this case because

Aquavita has failed to follow the parties' binding, contractual procedure for claims resolution:

> 8.5.4. In the event of a dispute in regard to the quality of the Bunkers delivered, **the samples drawn pursuant to clause shall be deemed to be conclusive and final evidence for the quality of the Product delivered**. In case of disputes one of the samples retained by Sellers shall be forwarded to a by both Sellers and Buyers agreed independent laboratory **for final and binding analyses**. The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present; and both parties shall have the right to appoint independent person(s) or institute(s) to witness seal breaking. No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorized person, such sample(s) shall be deemed to have no value as evidence.

> 8.5.8. When the Buyer raises a quality claim and gives a notice to the Seller, the former is deemed to have retained its set of sealed samples in full and to be ready to present it for analysis to a reputable independent testing laboratory approved by the Seller. The analysis of the samples shall be conducted in accordance with the established procedures in the presence of the Seller s representative. In the event that the Buyer is unable or unwilling to present its samples for analysis within 28 (twenty eight) calendar days starting from the date of the Seller s request to do so, the Seller may proceed with the Physical Supplier's samples analysis. **The results of such analysis shall be binding upon the parties to the Agreement.**

Bunker Holdings Limited, Standard Terms and Conditions of Sale and Delivery (Exhibit B

hereto)(emphasis added).

Aquavita agreed to the very simple - and conclusive - claims resolution procedure.

This claims procedure precludes Aquavita's action here.  Aquavita does not contend that

Bunker Holdings has failed to follow the procedure: in fact, both Aquavita and Bunker Holdings

agree that this is exactly the procedure to resolve the claims.

The problem is, however, that **Aquavita** has been unable to deliver its samples for testing: it could not (as of last report, June 30th) get its sample from the Vessel. Bunker Holdings has its samples, in hand (and, has tested one of them on its own and that test confirmed, that the sample was fine; see, Exhibit C hereto). In fact, both Aquavita and Bunker Holdings even had agreed, on the testing lab to be used ("Seybolt" in Rotterdam)(see, correspondence attached as Exhibit D hereto).

Consequently, the reason that testing (the conclusive dispute settlement procedure under the Acquavita-Bunker Holdings contract) hasn't been done, **is the fault of Aquavita**, not of Bunker Holdings. Aquavita does not even know if there is any proper basis for claim, because testing has not been done under the contract, but in any event, testing, as the contract confirms, is the final and binding dispute-settlement mechanism under the contract.

There is no basis for a claim of damages, under the contract; no ripe claim for arbitration (if there ever could be any arbitration claim; again, there has been no breach of the parties' contract, proved "conclusively" by testing, or any other breach) and therefore no *prima facie* admiralty claim under Rule B. For this further reason, just as this Court did in *T&O Shipping v. Lydia Mar Shipping Co. S.A.*, 415 F. Supp. 2d 310 (S.D.N.Y. 2006) should vacate the Rule B attachment and dismiss the complaint.

### C.    Aquavita Has Failed to Obtain (Or At Least to Claim Against) Any Insurance for the Losses Alleged. Any Such Insurance, is the Sole Security For Aquavita

The parties' contract also required the following:

14. INSURANCE

The Buyer is responsible for effecting and maintaining insurances which will fully protect the Buyer, the Seller and all third parties from all risks, hazards and perils associated with or arising from the Agreement.

Any claim that Farenco has against Aquavita, or that Aquavita may have against Bunker Holdings, is claim which insurance that Aquavita had to obtain, would both cover and secure against.

Evidently, Aquavita has failed to obtain this insurance, or has made no claim against it. Had Aquavita obtained, and claimed against the insurance, for the claims that Farenco has raised against Aquavita or otherwise, Aquavita would have no need to claim against Bunker Holdings. Instead, Aquavita would be fully covered against the Farenco (shipowner's) claims, as Bunker Holdings would be protected against Aquavita's claims.

Aquavita therefore further has no ground, to demand Rule B security here against Bunker Holdings, and this Court further should vacate the Rule B claim for this reason.

## II.    <u>Alternatively, This Court Should Reduce the Attachment Amount</u>

Whenever security is taken and a motion made, the court may reduce the amount of security given for "good cause shown" pursuant to Supplemental Admiralty Rule E(6). Fed. R. Civ. P. Supp. Rule (E)(6); *see also Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*, No. 05 Civ. 7173 (NRB), 2005 U.S. Dist. LEXIS 22409, 2005 WL 2446236, at *1 (S.D.N.Y. Oct. 3, 2005). The Court is required to determine whether the amount attached is "excessive" or "reasonably necessary to secure the plaintiff's claim." *A.R.A. Anomina Ravannate Di Armamento, SPA v. Heidmar Inc.*, No. 97 Civ. 1383, 1997 U.S. Dist. LEXIS 15291, 1997 WL 615495 (JSR) (S.D.N.Y. Oct. [*406]  6, 1997) (*quoting Rolls Royce Indus. Power (India) v. M.V. Fratzis M.*, No. 95 Civ. 2630 (CSH), 1995 U.S. Dist. LEXIS 22219, 1995 WL 846690, at *3 (S.D.N.Y. July 24, 1995)). This does not require the plaintiff to prove its damages with "exactitude." *Dongbu Express Co., Ltd. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996). However, "the court must be satisfied that the plaintiff's claims are not frivolous." *Id.*

*Ronda Ship Mgmt. v. Doha Asian Games Organising, Comm.*, 511 F. Supp. 2d 399**,** 406 (S.D.N.Y. 2007).

**A.    The Contract Limits Damages to the Bunker Price and Excludes
        Consequential Damages**

As set out above, Aquavita has no proven damages; it opposes Farenco's claim and may

never have to prove damages (because, there is no proof, which the parties' contract requires,

that the Bunker Holdings bunkers, were faulty).

Nevertheless, even if Aquavita had proven, certain damages, the parties' contract

expressly limits Aquavita's claims, as follows:

> 10. LIABILITY
>
> 10.1. Liabilities of the Seller for consequential damages is excluded. In any event
> and notwithstanding anything to the contrary herein, liability of the Seller shall
> under no circumstances exceed the invoice value of the Bunkers supplied under
> the relevant agreement to the relevant Vessel.

USD $378,140 was the value of the bunkers that Bunker Holdings sold to Aquavita (Invoice and

Bunker Receipt, attached as Exhibit E hereto).

If this Court finds that somehow, Aquavita has a proper *prima facie* admiralty claim,

which Aquavita does not, this Court accordingly should enforce the parties' contract and limit

Aquavita's damages claim to USD $378,140.

**B.    Aquavita's Claimed Damages Amount is Excessive**

If the Court holds that Aquavita should be able to maintain its attachment and complaint,

and does not enforce the parties' contractual damages limitation,  nevertheless Aquavita's

claimed damages amount still is excessive.

Aquavita demands USD $3,649,594.10, but, gives little detail of what, exactly, these

supposed damages are.

In fact, again, they are not damages at all, but instead, are claims by Farenco against

Aquavita, for which Aquavita denies responsibility.  The complaint states Aquavita's "damages" as follows:

| | | |
|---|---|---|
| A. | Principal claim: | $2,719,391.20 |
| B. | Estimated interest on claims:<br>3 years at 8%, compounded quarterly | $730,202.91 |
| C. | Estimated fees and costs: | $200,000.00 |
| | | Total $3,649,594.10 |

### a.    **Prejudgment Interest is Excessive**

The first, obviously excessive claim is for prejudgment interest.

The rule in this Circuit, however, is that the rate of interest used in awarding prejudgment interest rests firmly within the sound discretion of the trial court. *Independent Bulk Transp., Inc. v. The Vessel "MORANIA ABACO"*, 676 F.2d 23, 26 (2d Cir. 1982). A "plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." *Id.* at 27. In exercising its discretion, the district court determined that rather than using a single Treasury Bill rate applied retroactively over the relevant periods as initially proposed, using an average rate for each period would be fairer because the rate on Treasury Bills was subject to wide fluctuation during those periods.

*Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 311 (2d Cir. 1987).

As of July 9, 2008, the Treasury Bill rate, for one month Treasury Bills, was 1.82%.  (*See* United States Department of the Treasury, Daily Treasury Yield Curve Rates, http://www.ustreas.gov/offices/domestic-finance/debt-management/interest-rate/yield.shtml). Furthermore, the rule in the Second Circuit for maritime prejudgment interest does not provide for compounding, quarterly or otherwise.

Consequently, any prejudgment interest amount permitted, must be on the Treasury Bill rate, simple interest.  Any prejudgment interest amount will turn on whatever principal amount

Aquavita could demand, but, it would in any event be a fraction of the $730,202.91 which Aquavita demands here.

### b.    The "Estimated Fees and Costs" are Excessive

Aquavita again has not even bothered to go through the contractual testing procedures.  If it did, there would be few, if any "fees and costs"; for example, the question of whether or not the Bunker Holdings bunkers were faulty, or not, would be as a matter of contract conclusively established.

Aquavita's demand for fees and costs of course presumes that it would win any arbitration.  Aquavita, however, provides no idea of the basis of its apparently "ballpark" $200,000 fees and costs estimate.  At most, though, if the testing did show faulty bunkers sold by Bunker Holdings, all any arbitration or other proceeding would involve, would be proof of damages, a relatively limited procedure.

This Court accordingly should require Aquavita to specify the elements of its $200,000 fees claim; any real claim, would be a fraction of that.

### c.    The "Principal Claim" of $2,719,391.20 is Excessive

Aquavita's "principal" claim entirely fails the requirements of Supplemental Admiralty Rule E(2)(a) ("Complaint"):

> In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading.

For this reason alone, this Court should reduce, or eliminate,  that "principal claim."  What the $2,791,391.20 amount is, however, down to the last cent, is exactly the claim that Farenco had made, at least initially, to Aquavita in advance of arbitration, as detailed in a July 9, 2008 email

from Mark Seward, Aquavita's English solicitor in the claims, to Bunker Holdings (Exhibit F hereto).  Beginning his message, "This is the claim against us" - making clear that it is Farenco's figures, that Aquavita is providing, not figures that Aquavita agrees to - Aquavita's solicitor details "estimated" claims and includes a $120,000 amount for de-bunkering the Vessel, that Bunker Holdings itself would be responsible for (that is, does not have to be secured against; Bunker Holdings would do the de-bunkering and sell the bunkers removed).

Significantly, however, in the *Farenco Shipping Co. LTD v. Aquavita International S.A.*, 1:08-cv-04882-WHP matter, now pending in this Court, Farenco only has demanded USD $926,640 from Aquavita (Farenco Complaint, Exh. A hereto).   Consequently, given that Aquavita's attempt to claim here against Bunker Holdings in indemnity for amounts that Farenco claims from Aquavita, Aquavita's $2,791,391.20 claim **is overstated by $1,864,751.20** (alone, not considering overstatements for interest and legal expense).

Aquavita has paid none of the $2,791,391.20 amount it demands; coming from Farenco about $100,000 is "estimated" and it as against Farenco, Aquavita denies liability for the full amount.  This Court should scrutinize each amount demanded, and if it is not inclined to vacate the attachment and dismiss the complaint, or to limit damages as the parties contractually agreed, then, it should significantly limit the principal amount of Aquavita's claims.

**III.**

**This Court Should Require Aquavita to Post Counter-Security
and Stay this Case Until Aquavita Posts Counter-Security**

Bunker Holdings has claimed the amounts demanded, answered the complaint and

counterclaimed against Aquavita for breach of contract.

Federal Supplemental Admiralty Rule E(7)(a) ("Security on Counterclaim") provides as

follows:

> When a person who has given security for damages in the original action asserts a
> counterclaim that arises from the transaction or occurrence that is the subject of
> the original action, a plaintiff for whose benefit the security has been given must
> give security for damages demanded in the counterclaim unless the court, for
> cause shown, directs otherwise.  Proceedings on the original claim must be stayed
> until this security is given, unless the court directs otherwise.

Similarly, Supplemental Admiralty Rule E(2)(b) ("Security on Counterclaim") provides as

follows:

> Subject to the provisions of Rule 54(d) and of relevant statutes, the court may, on
> the filing of the complaint or on the appearance of any defendant, claimant, or any
> other party, or at any later time, require the plaintiff, defendant, claimant, or other
> party to give security, or additional security, in such sum as the court shall direct
> to pay all costs and expenses that shall be awarded against the party by any
> interlocutory order or by the final judgment, or on appeal by any appellate court.

Any final judgment for entry by this Court, will be one to confirm the arbitral award, and

consequently would include arbitrators fees, legal fees and related costs, as well as any principal

of the arbitral award and interest.

As set out above, Aquavita's contract with Bunker Holdings required Aquavita to

"effect[  ] and maintain[ ] insurances which will fully protect . . . [Bunker Holdings] . . from all

risks, hazards and perils associated with or arising from the Agreement."

Certainly, what Aquavita alleges in its complaint, is a "risk" arising from the bunker sale

-11-

agreement. If Aquavita has failed to obtain this insurance, however, it will be in breach of its contract to Bunker Holdings, and be liable in damages to Bunker Holdings, for the entire amount that Aquavita now might claims (in indemnity, once it pays any claims) from Bunker Holdings.

Further, because of Aquavita's breach of its contractual obligation to test its samples, it has further breached its contract with Bunker Holdings, causing Bunker Holdings to expend moneys for attorneys fees as well as lost interest on and use of the funds which Aquavita wrongfully has garnished.

The Aquavita-Bunker Holdings agreement further provides, as follows, that:

> 10.2. The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred by the Seller due to a breach of contract and/or fault or neglect of the Buyer, its agents, servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not onboard of the respective vessel(s).

This is in addition to Aquavita's English Law obligation (as well as under the rules of the London Maritime Arbitrators Association (LMAA), under whose rules the parties have agreed to arbitrate), to pay Bunker Holdings' fees and arbitration costs, if Bunker Holdings wins the arbitration.

Consequently, if this Court is inclined to permit Aquavita to maintain security for any part of supposed fees and costs that Aquavita would be entitled on successful arbitration, this Court further should require Aquavita to post the same amount against an arbitral fees and costs award to Bunker Holdings.

**IV.**
**Alternatively, This Court Should Stay All Proceedings,**
**First, for Posting of Counter-Security, Then, for Arbitration**

As set out above, Federal Supplemental Admiralty Rule E(7)(a)("Security on Counterclaim") states that:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given **must give security for damages demanded in the counterclaim** unless the court, for cause shown, directs otherwise. Proceedings on the original claim **must be stayed** until this security is given, unless the court directs otherwise.

Consequently, any proceedings, including garnishments and attachments, in this case following Bunker Holdings' counterclaim, are be stayed "until" Aquavita posts counter-security.

9 U.S.C. § 8 (" Proceedings begun by libel in admiralty and seizure of vessel or property") provides as follows:

> If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award.

The parties have agreed to arbitrate in London, and with property of Bunker Holdings attached, this Court now has jurisdiction to direct the parties to proceed to arbitration.

Pending the arbitration, this proceeding, and all proceedings to garnish and attach further property of Bunker Holdings, must be stayed. Under English law (the Arbitration Act of 1996, http://www.opsi.gov.uk/Acts/acts1996/ukpga_19960023_en_2#pt1-pb3-l1g9 ), Section 9 ("9 Stay of legal proceedings"):

> (1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which

-13-

under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.

\*    \*    \*

(4) On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed.

There is nothing in the (United States) Federal Arbitration Act, or, the English Act, recognizing or permitting continuous, perpetual garnishments and attachments through this Court, after this Court has obtained jurisdiction to direct the parties to arbitrate. In fact, the purpose of the garnishment is for jurisdiction; after this Court obtains jurisdiction, there should be no delay in ordering the parties to arbitrate, and, consistent with (and required by) English law, staying the action including all attachments and garnishments. Consequently, this Court should now stay the case, including all further garnishment and attachments, and order the parties to arbitration, pursuant to English law and 9 U.S.C. § 8.

## V.  This Court Should Vacate All Amounts Improperly Garnished

Aquavita applied for and obtained, an order from this Court permitting private process service of Rule B writs issued in this action, and permitting that they be considered valid throughout their day of service.

This Court also permitted the Clerk to issue supplemental process - that is - further process after the Clerk issued the initial writ.

Consequently, Aquavita obtained a single writ, issued by the Clerk July 2, 2008.

There is no indication that Aquavita ever obtained any other writ, after, initial service of this July 2, 2008, writ.

The continual service of a copy of a single writ, issued by the Clerk, after initial service,

-14-

is not permissible under the Federal Rules.

Supplemental Rule B(1)(b) does state that "The clerk may issue supplemental process enforcing the court's order upon application without further court order[ ]," however, that makes clear that any supplemental process, *eg*, further writ, must be actually issued by the Clerk.  A photocopy of a single-issued writ, is not "supplemental process."

This Court accordingly should order release of all amounts "garnished" or "attached," by service of copies of the July 2, 2008 writ rather than by the required, further "supplemental process," which Aquavita apparently did not request the Clerk to enter (there is no record of such request, on the Court's docket).

Dated: July 10, 2008.

LAW OFFICES OF GEORGE N. PROIOS, PLLC
George N. Proios (GP-9331)
Herald Square Building
1350 Broadway, Suite 1507
New York, NY  10018-7702
(212) 279-8880
Facsimile (212) 279-0670

Attorney for Bunker Holdings, Ltd.

OF COUNSEL:
J. Stephen Simms
W. Charles Bailey, Jr.
Simms Showers LLP
Suite 702
Twenty South Charles Street
Baltimore, Maryland 21201
410-783-5795
Fax: 410-510-1789

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 10, 2008 I caused the foregoing motion and memorandum to be filed on this Court's CM/ECF system for service on all record counsel.

08 CIV 4782

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY  10174
(212) 885-5000



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FARENCO SHIPPING CO. LTD.,

                    Plaintiff,

          v.

AQUAVITA INTERNATIONAL S.A.,

                    Defendant.

---

08 Civ.

**VERIFIED COMPLAINT**

---

Plaintiff FARENCO SHIPPING CO. LTD. ("FARENCO"), as Owner of the M/V
JIN XING, by its attorneys Blank Rome LLP, complaining of the above-named
Defendant AQUAVITA INTERNATIONAL S.A. ("Aquavita"), alleges upon
information and belief as follows:

1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more
fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of
the Federal Rules of Civil Procedure.  The Court has subject matter jurisdiction.

2.    At all material times, FARENCO was and now is a foreign company
organized and existing under the laws of the British Virgin Islands and the disponent
owner of the Motor Vessel JIN XING (the "Vessel").

3.    At all material times, defendant Aquavita was and now is a corporation organized and existing under the laws of the Marshall Islands.

## THE BASIC FACTS

4.    Farenco chartered the Vessel from Daeyang (HK) Shipping Co. Ltd. under a charter dated April 19, 2007 (the "Head Charter").  Ex. 1 to the Rule B affidavit ("Aff.").

5.    As recorded in a "fixture recap" dated on or about January 30, 2008, Farenco sub-chartered the Vessel to Aquavita (the "Charter").  The Charter incorporates the terms of the Head Charter except as provided therein. Aff. Ex. 2.

6.    Farenco contends that Aquavita purchased and loaded bunkers (marine fuel oil) that were off-specification leading to the damages asserted and identified below.

7.    Claims under the Charter are subject to English law and London arbitration. This action is expressly filed without prejudice to that right of arbitration.

## COUNT I

## RULE B RELIEF

8.    Plaintiff repeats paragraphs  1 through 7 as if fully set forth herein.

9.    Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims including its English attorneys' fees and arbitrators' fees which are routinely awarded in London arbitration and no security for Plaintiff's claim has been posted by Aquavita or anyone acting on its behalf to date.

10.    At best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

2

| 1. | Value of new bunkers supplied at Dakar to replace the bad quality bunker (about USD 400,000 | $400,000 |
|----|----|----|
| 2. | Port costs/surveyor costs at Dakar (about Euro 30,000) | $60,000 |
| 3. | Daily hire (USD 60,000 per day) losses with present TC Charterers Korea Line Corp from 30 Apr to 20 May (pending) | $126,000 |
| 4. | Estimated Recoverable English Lawyers and Arbitrators' Fees & "Costs" | $200,000 |
| 5. | Interest over the course of 3 years at prime rate average of 8% per annum: | $140,640 |
| | **TOTAL**: | $926,640 |

11.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against Aquavita, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That since Aquavita cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Aquavita's tangible or intangible property or any other funds held by any garnishee, which are due and owing to Aquavita up to the amount of $926,640 to secure the Plaintiff's claims, and that all

persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

    C.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

    D.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: New York, NY
      May 27, 2008

                    Respectfully submitted,
                    BLANK ROME LLP
                    Attorneys for Plaintiff

                    By _____
                      Jeremy J.O. Harwood (JH 9012)
                    405 Lexington Avenue
                    New York, NY 10174
                    Tel.:  (212) 885-5000

## VERIFICATION

STATE OF NEW YORK     )
                            : ss.:
COUNTY OF NEW YORK   )

Jeremy J.O. Harwood, being duly sworn, deposes and says:

1.     I am a member of the bar of this Honorable Court and of the firm of Blank Rome LLP, attorneys for Plaintiff.

2.     I have read the foregoing Complaint and I believe the contents thereof are true.

3.     The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.     The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

_____
Jeremy J.O. Harwood

Sworn to before me this
27th day of May 2008

_____
Notary Public

**KARL V. REDA**
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Filed in New York County
Commission Expires   Nov. 30, 2009

## VERIFICATION

STATE OF NEW YORK    )
                          : ss.:
COUNTY OF NEW YORK  )

      Jeremy J.O. Harwood, being duly sworn, deposes and says:

      1.    I am a member of the bar of this Honorable Court and of the firm of Blank Rome LLP, attorneys for Plaintiff.

      2.    I have read the foregoing Complaint and I believe the contents thereof are true.

      3.    The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

      4.    The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

                                       Jeremy J.O. Harwood

Sworn to before me this
27th day of May 2008

Notary Public

KARL V. REDA
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Filed in New York County
Commission Expires Nov. 30, 2009

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FARENCO SHIPPING CO. LTD.,

                Plaintiff,

       v.

AQUAVITA INTERNATIONAL S.A.,

                Defendant.

08 Civ.

**AFFIDAVIT UNDER
SUPPLEMENTAL RULE B**

---

STATE OF NEW YORK   )
                   : ss.:
COUNTY OF NEW YORK  )

      JEREMY J.O. HARWOOD, being duly sworn, deposes and says:

      1.    I am a member of the Bar of this Honorable Court and a member of the firm of Blank Rome LLP, attorneys for the Plaintiff herein. I am familiar with the circumstances of the complaint and submit this affidavit in support of Plaintiff's request for the issuance of process of maritime attachment and garnishment of the property of defendant AQUAVITA INTERNATIONAL S.A., a company or ganized and existing under the laws of the Marshall Islands, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.    The defendant is not incorporated or registered to do business in this State.

3.    Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, Transportation Tickler (2008 edition), telephone assistance in New York City, and the internet Yellow Pages.

4.    In our search, we did not find any listing or reference to defendant in this district or state.

5.    In the circumstances, I believe the defendants cannot be "found" within this district.

6.    I attach as Exhibit 1 hereto a copy of the Head Charter described in the complaint.

7.    I attach as Exhibit 2 a true copy of the Charter as described in the complaint.

_____
Jeremy J.O. Harwood

Sworn to before me this
27th day of May, 2008

_____
Notary Public

**KARL V. REDA**
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Filed in New York County
Commission Expires Nov. 30, 2009

## BUNKER HOLDINGS LIMITED

### STANDARD TERMS AND CONDITIONS OF SALE AND DELIVERY

### 1. DEFINITIONS

1.1. **Agreement** means an agreement between the Seller and the Buyer concluded by way of exchange of written confirmation messages (including facsimile, telex or e-mail messages). The Agreement shall incorporate these terms and conditions.

1.2. **Basic Cost** means the basic cost of the Product calculated by multiplying the Unit Price by the quantity of the Product delivered to the Vessel.

1.3. **Buyer** means the party requesting the Seller to arrange for the delivery of the Product, and defined as being so in the Confirmation, as well as any party acting on behalf thereof.

1.4. **Confirmation** means a confirmation message sent to the Buyer by the Seller to confirm conclusion of the Agreement.

1.5. **Due Date** means the date when payment is to be made according to the Confirmation.

1.6. **Owner** means the registered Owner or Bareboat Charterer of the vessel;

1.7. **Physical Supplier** means the party which delivers the Product directly to the Vessel.

1.8. **Place of Delivery** means the port or other readily identifiable geographical location specified in the Confirmation as the place where the Product is to be delivered.

1.9. **Product** means marine bunker fuel, oil, lubricants, etc., the exact fuel grade and specification to be agreed upon in writing between the Seller and the Buyer for every delivery separately.

1.10. **Seller** means Bunker holdings limited, 4th floor, Vashiotis Business Center, 156 28th October & Iakovou Tompazi Street, 3107, Limassol, Cyprus.

1.11. **Unit Price** means the cost of metric ton or other unit of the Product in  United States Dollars (USD).

1.12. **Vessel** means the vessel duly nominated to receive the Product as  specified in the Confirmation.

### 2. APPLICABILITY

2.1. Unless explicitly agreed otherwise, these terms and conditions shall apply to all offers, quotations, orders, services relating to supplies of the Product by the Seller.

2.2. Each Agreement shall be evidenced by the Seller s written Confirmation. In the event of any conflict between these terms and conditions and the terms of the Confirmation, the ones of the latter shall prevail.

2.3. An Agreement between the Buyer and the Seller shall not be deemed concluded and these terms and conditions shall not apply without written Confirmation of the Seller.

### 3. ENTIRETY AND VALIDITY OF THE AGREEMENT

These terms and conditions together with the Confirmation constitute the entire Agreement. No derogation, addition or amendment of the Agreement shall be in force or in effect unless or until expressly agreed between the parties. If any provision of the Agreement is invalid to any extent or unenforceable, the remainder of the Agreement shall not be affected thereby.

### 4. DELIVERY

#### 4.1. Allocation

If the Seller at any time and for any reason considers that there may be a shortage of the Product in the Place of Delivery, it may allocate the available quantity of the Product among its customers.

#### 4.2. Restrictions

The Seller shall not be bound to export any Product if permit of state bodies is required for such kind of export and the Seller has not been granted such permit. In such a case the Seller shall not be held financially or otherwise responsible for the non-delivery

### 4.3. Means of Delivery

Delivery shall be made in such number of consignments and by such means as the Seller considers appropriate in the circumstances.

### 4.4. Barging

When delivery is made by a barge(s), the Buyer shall, at its own expense, provide safe and clear berthing for the barge(s) alongside the Vessel s receiving lines as well as all necessary facilities and assistance required to effect delivery. The Buyer shall pay and indemnify the Seller against all claims and expenses in respect of any loss, damage or delay caused by the Vessel to any such barge and/or its equipment.

### 4.5. Connection

The Buyer shall connect the pipelines/delivery hoses with the Vessel s intake line, render all necessary assistance and provide sufficient tankage and equipment for prompt receipt of the Product. The Buyer is responsible for ensuring that the Product is delivered at a safe pressure and that all the utilized equipment is in safe and satisfactory condition. For the purpose of ensuring the safe pressure, the Seller must be informed by the Buyer of the pressure level applicable to the Vessel equipment.

### 4.6. Passing of Ownership

Delivery shall be deemed completed when the Product has passed the flange connecting the Physical Supplier s delivery facilities with the receiving facilities provided by the Buyer. However, the title of ownership of the Product shall pass to the Buyer only after the payment has been received by the Seller as provided in Clause 8. Until the payment is received by the Seller, the person in possession of the Product delivered shall hold the Product for the Seller as a mere bailee.

### 4.7. Passing of Risk

The Seller s responsibility for the Product shall cease and the Buyer shall assume all risks and liabilities relating to deterioration, deprecation, contamination, evaporation or shrinkage of the Product as well as responsibility for any loss, damage and harm caused by pollution or in any other manner to third parties when the Product has passed the flange connecting the Physical Supplier s delivery facilities with the receiving facilities provided by the Buyer. The Buyer agrees to indemnify the Seller without any limitation in respect of any liability, claim or demand for which the Buyer is liable.

### 4.8. Measurement

The quantities of bunkers shall be determined from the official gauge or meter of the bunkering barge or tank delivery or of the shore tank in case of delivery ex wharf.
The Buyer or his representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made.
Should the Buyer or his representative fail or decline to verify the quantities, the measurements of quantities made by the Seller shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to the variance.

Upon the agreement between the Seller and the Buyer the measurements can be evidenced by an independent certified surveyor. The costs for the surveyor services shall be shared equally between the Seller and the Buyer.

### 4.9. Specification

The Product to be delivered shall be as specified in the Confirmation or, otherwise, it shall be one of the Seller s commercial grades of Product currently offered generally to its customers at the Place of Delivery for marine bunkering and lubrication purposes. No other warranty as to the quality or fitness of the Product for any purpose shall be contained in the Agreement.

In order to determine the quality of the Product delivered, Seller shall be entitled to draw or cause to be drawn, samples of each delivery from Supplier s designated facilities, and to have them sealed. Where reasonably practical, the samples shall be taken in accordance with ISO-8217, but shall otherwise be taken from a point and in manner chosen by Seller or its representative.

The Buyer shall have the sole responsibility for the nomination of the grades of the Product fit for use by the Vessel. The Seller warrants that the Product shall be of a homogeneous and stable nature, shall comply with the grades nominated by the Buyer and be of satisfactory quality. The Product shall in all respects comply with SPECIFICATION as mentioned in Seller's Confirmation.

### 4.10. Compatibility and Segregation

Responsibility for determining compatibility of the Product delivered with any other Product or Products and for segregating or commingling of the same rests solely with the Buyer.

### 4.11. Substitution

Subject to the provisions of this Clause, the Seller may discharge its obligation to deliver the Product specified in the Confirmation by supplying, in substitution thereof, Product of a different grade and/or brand name always provided that such substitute Product is of equal or superior quality to that specified in the Confirmation.

### 4.12. Availability

The Seller shall ensure that the Product is delivered promptly upon the Vessel's arrival but the Seller shall not be responsible for any loss, expense, damage or increased costs incurred in consequence of the Buyer s failure to provide the Vessel in time or the Vessel s delay or restraint for any other reason whatsoever.

### 4.13. Delay

In the event that the Vessel's arrival at the Place of Delivery is delayed or is likely to be delayed the Buyer must so advise the Seller. The Buyer should also ensure that the Vessel's agent at the Place of Delivery is similarly informed and that the agent advises the Physical Supplier accordingly. At the Buyer s request the Seller shall use its best endeavors to deliver the Product to a delayed Vessel on the terms originally agreed but reserves the right to pass on to the Buyer all additional costs including increased Basic Cost arising from the Vessel's delayed arrival.

### 4.14. Notice and Other Delivery Requirements

The Buyer shall give the Seller at least seven (7) days prior notice of deliveries required, specifying the name of the Vessel, Vessel's agents, approximate date of delivery, grade and quantity of the Product. The Buyer or Vessel's local agents shall give to the Seller or a physical supplier at least than 72 (seventy-two) hours notice (excluding Saturdays, Sundays, public holidays and other non-working days at the Place of Delivery) of the Vessel's readiness to receive the Product and provide the Vessel name, IMO number, exact quantity and time of the Product required, and exact location and time at which delivery is required.

Notice must be given during the Seller s normal business hours (Monday to Friday inclusive, 08.00-18.00 CET). Notice given outside these hours shall be deemed to have been given at 08.00 on the first business day thereafter.

4.15. If the Buyer for whatever reason is unable to receive the full quantity ordered and rendered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the Product back to the storage or by having to sell the bunkers in a degraded form at a lower price than that applicable to the grade originally nominated by the Buyer. The Seller may use this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these terms.

4.16. If delivery is required outside normal business hours or on local weekends, Saturday, Sunday or national Christian holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

4.17. The Buyer agrees to reimburse the Seller for overtime and/or other additional expenses incurred due to the failure of the Buyer, its servants or Vessel's local agents to provide the Seller or a physical supplier with sufficient prior notice of amendments of delivery time, quantity changes or cancellations.

## 5. PRICE

### 5.1. Unit Price

Where in the Confirmation the Unit Price is stated not to be subject to variation the Unit Price shall, subject to Clause 4.13, not to be varied unless otherwise agreed between the Parties. In all other cases having agreed the Unit Price of the Product the Seller will endeavour to refrain from making any increase and any

increase if required shall be specifically and expressly agreed with the Buyer in writing. Notice of increase shall be given during the Seller s normal business hours (Monday to Friday inclusive, 08.00-18.00 CET). Notice given outside these hours shall be deemed to have been given at 08.00 on the first business day thereafter. In such event the Buyer may forthwith give written notice of cancellation of the Agreement to the Seller. If no such notice is received by the Seller within two (2) hours after it has served the notice of increase, the Buyer shall be deemed to have agreed to the revised Unit Price.

### 5.2. Additional Costs

In addition to the Basic Cost of the Product the Buyer agrees to pay for any charges raised in respect of taxes, freight, barge, vehicle, wagon or clean up costs including overtime or other such payments; insurance, pilotage; port dues and any other such costs and expenses incurred by or charged to the Seller.

### 5.3. Proof of Delivery

The Buyer or its representative shall accept delivery of the Product and obtain at the time of delivery all necessary information relating to delivery including the exact quantity and precise specification of the Product delivered. Unless the Buyer has requested otherwise before the Confirmation is sent by the Seller, the Seller shall be under no obligation at any time to provide the Buyer with any evidence of delivery of the Product to the Vessel.

### 6. PAYMENT

In most cases special terms of payment shall be agreed and set out in the Confirmation. Each of the following terms shall apply unless the Confirmation provides otherwise:

6.1. The payment shall be made in United States Dollars (USD) to the bank account specified by the Seller in full without set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s) so as to ensure that the Seller receives the full amount due to it on or before the Due Date.

6.2. The Due Date is as provided in the Confirmation or, in default, the date of Delivery.

6.3. If the party requesting the Product is not the Owner of the Vessel, the Seller shall have the right to insist as a precondition of sale that a payment guarantee is provided by the Owner. Owner is specified in Clause 1. The Seller shall have the right to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner.

6.4. Timely payment is of the essence of the Agreement.

6.5. If the Buyer fails to make payment on or before the Due Date, it shall be charged with 2.5 % (two and a half per cent) of the outstanding sum per calendar month calculated on a daily basis starting from the Due Date up to receipt of the cleared outstanding funds by the Seller. The interest accrued shall be added to and become the part of the outstanding sum. In the event that such rate of interest specified in the Agreement is in the excess of that permitted by relevant law, it shall be substituted by the maximum rate of interest so permitted.

6.6. Payment shall be made by way of telegraphic, swift or rapid electronic transfer to the bank account specified by the Seller. All bank and other charges, if any, incurred in connection with funds remittance shall be for the Buyer s account. Notice of remittance including identifying references shall always be given to the Seller.

6.7. Payments received by the Seller from the Buyer or other party acting on behalf of the Buyer notwithstanding any specific requests to the contrary shall be applied to settle the outstanding sums in the following order:

> 6.7.1. Interest accrued in respect of the overdue transactions where the principal sum has been previously paid.

> 6.7.2. Interest accrued in respect of all other transactions.

> 6.7.3. All the outstanding principal sums starting from the oldest one and proceeding chronologically up to the most recent one.

> 6.7.4. Any principal sum which the Seller knows or reasonably expects to fall due at a future date.

6.8. The Buyer and the Owner of the Vessel are jointly and severally liable for payment. The vessel stamp on the bunker delivery receipt shall evidence that the owner of the Vessel has agreed to incur such liability.

6.9. The overdue payments shall constitute a lien against the Vessel to the extent permitted by pertinent local law.

6.10. The Seller may in good faith vary, amend, withdraw, substitute or supplement the terms relating to payment at any time in the course of a transaction in such a manner as it, at its absolute discretion, considers necessary to protect its interests.

6.11. If at any time reputation, standing, creditworthiness, liquidity or solvency of the Buyer thereof gives to the Seller a reasonable cause for concern, the Seller may, without prejudice to all other rights and remedies which it may have, give a notice to the Buyer that credit facilities from the Seller to the Buyer are withdrawn or suspended as the case may be and all outstanding sums shall thereupon fall due for immediate payment.

6.12. In the event that either party is the subject of debt, bankruptcy or liquidation proceedings, the other party may forthwith terminate the Agreement.

6.13. All legal and other costs and expenses incurred by either party including those of either party s legal department and of other lawyers acting on behalf of such party in connection with the other party s failure to comply with any term of the Agreement shall be for the defaulting party s account.

## 7. CANCELLATION OF ORDER BY THE BUYER

7.1. The Buyer shall have the right to cancel all deliveries by giving the Seller or Supplier at least seventy two (72) hours prior written notice of such cancellation.

7.2. If the Buyer at any time cancels an order of the Product or fails to take delivery of a whole consignment or a part of it on the Vessel, the Seller reserves the right to pursue a claim against both the Buyer and the Vessel for all damages thereby suffered including loss of profit.

## 8. CLAIMS, DISPUTES AND PRECAUTIONS

### 8.1. Notification

A written notice of claim or a potential claim must be given to the Seller within the time limit specified in these terms and conditions or in the Confirmation. It is the Buyer s responsibility to ensure that the notice is received by the Seller whose confirmation of receipt should always be sought.

### 8.2. Sufficiency of Information

To enable the Seller to investigate and pursue a claim, the notice must provide sufficient information for the Seller to be able to identify the relevant transactions, the nature of the complaint and the loss or damage alleged. Any notice which does not give such sufficient information shall not be valid. For the same reason the Buyer shall provide a full and complete response to any and all questions, inquiries and requests made by the Seller concerning the claim and the matters relating thereto.

### 8.3. Categories of Claims

For the purposes of these terms and conditions all possible claims and disputes arising out of the Agreement are divided into three categories:

   8.3.1. Quantity claims and disputes.

   8.3.2. Quality claims and disputes.

   8.3.3. Other claims and disputes.

### 8.4. Quantity Claims and Disputes

8.4.1. For bulk supplies delivery barges, wagons and vehicles must be checked by tank-dipping to measure the content and to ensure full turn-out. Flow meters must be checked for seals, correct settings, calibration and general condition. All such checks must be carried out before and after delivery of each consignment of the Product as well as before and after each loading of a barge, wagon or vehicle tank. The delivery of the

Product must be supervised at all times and care must be taken to ensure that all documentation is complete and accurate before signing and stamping it. Any discrepancy must be recorded in the Physical Supplier's delivery receipt. Unless these procedures are observed, it is nearly always impossible for a claim to be substantiated. The Seller shall therefore reject the claims for short delivery where the above receiving procedures have not been observed.

8.4.2. The Seller shall not accept a claim for short delivery based on the figures obtained by measuring the Product in the Vessel's tanks.

8.4.3. The time limit for receipt of a notice of a quantity claim by the Seller is 7 (seven) calendar days starting from the date of delivery or a shorter period if agreed between the Parties and specified in the Confirmation.

**8.5. Quality Claims and Disputes**

8.5.1. It is the Buyer s responsibility to ensure that the Product tendered for the supply is that required by the Vessel and is delivered into correct tanks.

8.5.2. Four (4) representative samples of each consignment must be taken during the process of delivery of the Product immediately to the Vessel. The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, Product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the Bunker Delivery Receipts (BDR), and by signing the BDR both parties agree to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this clause. Two (2) sets of samples must be retained by the Physical Supplier, the other two (2) sets must be retained by the Buyer or the receiving Vessel. One sample shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required.

8.5.3. The Buyer and Seller agree that only analyses of sealed samples taken as "drip samples" at the sampling valve on the bunkering barge shall form the basis of documentation that bunker oil was substandard or "off-spec" when delivered. In case that drip sampling is not available onboard barge, tanktruck or shoretank, representative samples shall be taken as a composite of each tank divided with 1/3 from each the top/mid/bottom of the tanks of Supplier s facilities. No samples subsequently taken shall be allowed as (additional) evidence.

8.5.4. In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to clause shall be deemed to be conclusive and final evidence for the quality of the Product delivered. In case of disputes one of the samples retained by Sellers shall be forwarded to a by both Sellers and Buyers agreed independent laboratory for final and binding analyses. The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present; and both parties shall have the right to appoint independent person(s) or institute(s) to witness seal breaking. No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorized person, such sample(s) shall be deemed to have no value as evidence.

8.5.5. Any samples drawn from the Receiving Vessel s tanks shall not be valid as an indicator of the quality supplied.

8.5.6. Likewise when quantity claims are raised, it is important to check that all documentation is in order and to note discrepancies in the Physical Supplier's delivery receipt before signing and stamping it.

8.5.7. If the Buyer has grounds to believe that the Product supplied does not meet the relevant specification contained in the Confirmation or is defective, the Buyer shall immediately:

  8.5.7.1. take all reasonable steps to mitigate the consequences of the supply of possibly defective or incorrect Product;

  8.5.7.2. give a notice containing full details of possibly defective or incorrect Product to the Seller together with information about the Vessel's position, destination and ETA; the quantity and location of all bunkers on board the Vessel, the rate and the quantity of consumption since their delivery and their location immediately prior to consumption; for each of the three preceding supplies to the Vessel  quantity, quality and specification of the Product supplied, the place and the date of supply and the name of the supplier;

  8.5.7.3. inform the Seller of the whereabouts of the Buyer s set of samples.

8.5.8. When the Buyer raises a quality claim and gives a notice to the Seller, the former is deemed to have

retained its set of sealed samples in full and to be ready to present it for analysis to a reputable independent testing laboratory approved by the Seller. The analysis of the samples shall be conducted in accordance with the established procedures in the presence of the Seller s representative. In the event that the Buyer is unable or unwilling to present its samples for analysis within 28 (twenty eight) calendar days starting from the date of the Seller s request to do so, the Seller may proceed with the Physical Supplier s samples analysis. The results of such analysis shall be binding upon the parties to the Agreement.

8.5.9. If it is alleged that any equipment or machinery has been damaged by a defective Product, full details and evidences of the alleged damage must be given to the Seller as early as possible. The damaged item must be preserved and provided for inspection on demand of the Seller or its representative at any reasonable time.

8.5.10. The time limit for the Seller to receive a notice of a quality claim is 7 (seven) calendar days starting from the date of delivery or a shorter period if specified in the Confirmation.

## 8.6. Other Claims and Disputes

Notice of any other claim excepting all claims relating to or associated with those relating to the matters of quality and quantity, shall be given to the Seller as soon as possible but in any event not later than 28 (twenty-eight) calendar days after delivery. If the Confirmation provides for a shorter period, such shorter period shall apply.

## 8.7. Summary of the Time Limits

8.7.1. Quantity claims and disputes — 7 (seven) calendar days.

8.7.2. Quality claims and disputes — 7 (seven) calendar days.

8.7.3. Other claims and disputes — 28 (twenty-eight) calendar days.

8.7.4. Time period for presenting a notice of any claim to the Seller shall commence from the date of delivery of the Product in question.

8.7.5. All time limits for any claim are subject to substitution by a shorter time limit agreed between the Parties and stipulated in the Confirmation.

8.8. The Buyer shall be obliged to make payment in full and fulfill all other obligations in accordance with the terms hereof, whether or not they have any claims or complaints.

## 9. FORCE MAJEURE. EXEMPTION OF LIABILITY

9.1 The Seller, the Seller's supplier or the Buyer shall not be liable for any loss, damage or demurrage due to any delay or failure in performance (a) because of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Product or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller's supplier is interrupted, unavailable or inadequate for any cause whatsoever is not within the immediate control of the Seller or the Seller's supplier, including (without limitation) if such is caused by:

9.1.1. Act of God.
9.1.2. Act of war.Act of public enemies.
9.1.3. Quarantine restrictions.
9.1.4. Strikes or lockouts or stoppage or restraint of labour from whatever cause, whether partial or general.
9.1.5. Riots and civil commotions.
9.1.6. Saving or attempting to save life or property at sea.
9.1.7. Any other cause arising without the actual fault or privity of the party being in breach of the Agreement, or without the fault or neglect of the agents or servants thereof.

9.2. The Seller or the Seller's supplier shall not be required to remove any such cause or replace any effected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Seller's supplier's normal practices. The Seller or the Seller's supplier shall not be required to make any deliveries omitted in accordance with this clause at any later time.

9.3. If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

9.4 In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

9.5. The circumstances mentioned above and duration thereof shall be evidenced by the certificate issued by the competent authorities at the place where such circumstances took place, such as by national Chambers of Commerce, etc.

### 10. LIABILITY

10.1. Liabilities of the Seller for consequential damages is excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

10.2. The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred by the Seller due to a breach of contract and/or fault or neglect of the Buyer, its agents, servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not onboard of the respective vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller with direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

10.3. No servant or agent of the Seller (including independent (sub)contractors from time to time employed by the Seller) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from liability, defense or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller acting as aforesaid.

### 11. ARREST OF THE VESSEL

11.1. Notwithstanding anything to the contrary herein and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly authorizes the Seller to arrest the Vessel in question, or any other Vessel owned or operated by the Buyer, under any applicable jurisdiction as security for the obligations of the Buyer. Should the Buyer fail to make any payment to the Seller immediately when due the Seller may dispose of such arrested Vessel whether by sale or otherwise as applicable under the relevant jurisdiction. Any costs or expenses of whatever kind incurred by the Seller in respect of such arrest shall be for the sole account of the Buyer and shall be added to the claim for which arrest is made.

11.2. The Seller shall have the right to obtain a payment guarantee from the Owner as set forth in Clause 6.3. If such guarantee has been given by the Owner and the Owner has not paid the outstanding amount to the Seller within 5 (five) business days after proper written notice has been received, the Seller has the right to arrest the Vessel or any other Vessel owned or operated by the Owner. The Seller shall further have the right to dispose of such Vessel as set forth in Clause 10.1 above.

### 12. SPILLAGE, ENVIRONMENTAL PROTECTION

12.1. If a spill occurs while the Product is being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Product and mitigate the effects of such spill.

12.2. Without prejudice to the generality of the foregoing the Seller is hereby authorized in its full discretion at the expense of the Buyer to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Product and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence.

12.3. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any program for the prevention thereof, that are required by the Seller, or are required by law or regulation applicable at the time and place of delivery.

### 13. LAW AND JURISDICTION

13.1. The Agreement shall be governed by English law and any dispute arising out of or in connection with this Contract shall be referred to and finally settled by arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or reenactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three (3) arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

13.2. For the sole benefit of the Seller it is further agreed that the Seller without prejudice to any rights hereunder of the Seller or any claim raised pursuant to Clause 13.1. above have the right to proceed against the Buyer, any third party or the Vessel in such jurisdiction as the Seller in its sole discretion sees fit inter alia for the purpose of securing payment of any amount due to the Seller from the Buyer or the Owner (pursuant to a payment guarantee). In such circumstances the proceedings shall be governed by the law (substantive and procedural) of such jurisdiction.

### 14. INSURANCE

The Buyer is responsible for effecting and maintaining insurances which will fully protect the Buyer, the Seller and all third parties from all risks, hazards and perils associated with or arising from the Agreement.

### 15. LICENSES, PERMITS AND APPROVALS

Either party is responsible for obtaining respective necessary permits, licenses and approvals required to enable either party to execute all their rights and obligations under the Agreement.

### 16. WAIVER

Failure to enforce any right by any party to the Agreement against any other party shall not be a waiver of the right or in any way affect the validity of the Agreement. In particular, granting of any additional time by the Seller to make payment or waiving or reducing of any financial or other charges shall not prevent the Seller from exercising any of its contractual rights at any time thereafter.

### 17. VALIDITY

17.1. These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by Bunker holdings limited, any associated company, representative or agent as of April 2, 2007, or at any later date.

17.2. These terms and conditions are available on the website www.transbunker.com, on which site as well the Sellers may notify of any further amendments, alterations, changes or verifications to same. Such amendments, alterations, changes, etc. are deemed to be a part of the entire terms and conditions once same have been advised on the website.



**INSPECTION REPORT No: ODL 0830-0328**         **Object**      **RECEIVED SAMPLE**
Report date                          01.05.2008

ANALYSIS REPORT

| | | | |
|---|---|---|---|
| Sample submitted as | IFO (Fuel Oil) | | Page 1 of 1 |
| Received by laboratory | 30.04.2008 | | |
| Marked | **Sample from: JIN XING; Tanks 9, 12, 14, 15, 16.** | | |

| | | | |
|---|---|---|---|
| Quantity / Seal number | 1 x 1 Ltr | 17792029 | |
| Date / Place sampling | 15.04.2008 | Sample delivered by client's representative | |

| Test | Unit | Method | Result |
|---|---|---|---|
| WATER BY DISTILLATION | V/V% | ISO 3733 | **0.70** |
| HOT FILTRATION POTENTIAL | MASS% | ISO 10307-2 | **0.10** |

For evaluation of the results the method's precision statement applies, also, please refer to ASTM 3244-07a, IP367/96 and IP standard (Test Methods) Appendix E, Standard Practice for Utilization of Test Data to Determine Conformance with Specifications or latest equivalent. The above results relate only to the samples tested. Analysis performed at SGS laboratory in accordance with the latest issue of the relevant test method, unless otherwise stated.

Signed and dated in Odessa
01.05.2008



**For and on behalf of**
**SGS UKRAINE**

All SGS services are rendered in accordance with the applicable SGS conditions of service available on request and accessible at **http://www.sgs.com/terms_and_conditions.htm**

FE "SGS UKRAINE"    40/42 Atamana Golovatogo Street Odessa 65003 Ukraine  t +38 048 7869600  f +38 048 7869650  e sgs.ukraine@sgs.com
ИП "СЖС УКРАИНА"    40/42 ул. Атамана Головатого, г.Одесса, 65003 Украина  т +38 048 7869600  ф +38 048 7869650  www.ua.sgs.com

Member of the SGS Group (Societe Generale de Surveillance)



**INSPECTION REPORT No:** ODL 0830-0328          Object          **RECEIVED SAMPLE**
Report date                     15.05.2008

## ANALYSIS REPORT

| | | |
|---|---|---|
| Sample submitted as | IFO (Fuel Oil) | Page 1 of 1 |
| Received by laboratory | 30.04.2008 | |
| Marked | **Sample from: KRYLYON; Tanks 9, 12, 14, 15, 16.** | |

| | | |
|---|---|---|
| Quantity / Seal number | 1 x 1 Ltr | 17792029 |
| Date / Place sampling | 15.04.2008 | Sample delivered by client's representative |

| Test | Unit | Method | Result |
|---|---|---|---|
| DENSITY AT 15 oC | KG/M3 | ISO 3675 | **948.7** |
| KINEMATIC VISCOSITY AT 50 oC | MM2/S | ISO 3104 | **143.5** |
| FLASH POINT | oC | ISO 2719 | **120.0** |
| POUR POINT (upper) | oC | ISO 3016 | **plus 27** |
| CARBON RESIDUE | MASS% | ISO 10370 | **6.6** |
| ASH | MASS% | ISO 6245 | **0.051** |
| WATER BY DISTILLATION | V/V% | ISO 3733 | **0.70** |
| SULPHUR | MASS% | ISO 8754 | **1.44** |
| VANADIUM | MG/KG | IP 470 | **51** |
| ALUMINIUM + SILICON | MG/KG | ISO 10478 | **29** |
| HOT FILTRATION POTENTIAL | MASS% | ISO 10307-2 | **0.10** |

For evaluation of the results the method's precision statement applies, also, please refer to ASTM 3244-07a, IP367/96 and IP standard (Test Methods) Appendix E, Standard Practice for Utilization of Test Data to Determine Conformance with Specifications or latest equivalent. The above results relate only to the samples tested. Analysis performed at SGS laboratory in accordance with the latest issue of the relevant test method, unless otherwise stated.

Signed and dated in Odessa                    **For and on behalf of**
15.05.2008                                                              **SGS UKRAINE**

All SGS services are rendered in accordance with the applicable SGS conditions of service available on
request and accessible at http://www.sgs.com/terms_and_conditions.htm

FE "SGS UKRAINE"   40/42 Atamana Golovatogo Street Odessa 65003 Ukraine   t +38 048 7869600   f +38 048 7869650   e sgs.ukraine@sgs.com
ИП "СЖС УКРАИНА"   40/42 ул. Атамана Головатого, г.Одесса, 65003 Украина   т +38 048 7869600   ф +38 048 7869650   www.ua.sgs.com

Member of the SGS Group (Societe Generale de Surveillance)

**From:**        "Bunker Holdings / Y.Kharchenko" <bunkerholdings38@transbunker.com>
**To:**          "Mark Seward" <MSeward@m-f-b.co.uk>
**Date:**        6/2/2008 10:46:08 AM
**Subject:**     RE: JIN XING - CONTRACT DATES 2 APRIL 2008 - WITHOUT PREJUDICE

Dear Mark,

yes, we agree that sample No 17792047, our
sample as retained on board, be bindingly analysed at Saybolt Rotterdam


Best regards,
Yuriy Kharchenko

Bunker Holdings Ltd.
Limassol, Cyprus

Tel: +357 25 859738
Fax: +357 25 353595
Mob: +357 99 418976
E-mail: bunkerholdings@transbunker.com



>>> "Mark Seward" <MSeward@m-f-b.co.uk> 2.6.2008 17:34 >>>

DATE:  2 June 2008
TO:       Bunker Holdings - bunkerholdings@transbunker.com
REF/ATT:        Yuriy

OUR REF:        MS/SKU/0059/282461
MATTER:         JIN XING

We refer to recent exchanges.  In the light of your previous indications
we are proposing to analyse some samples and expect Owner comments
today.  Would you be prepared to agree that sample No 17792047, your
sample as retained on board, be bindingly analysed at Saybolt Rotterdam?
Subject to Owners confirmation this could possibly be agreed from our
side.
We look forward to hearing from you by return please.
Regards

Mark Seward
Partner
MFB
----------------------------------------------------------

  M   F   B   45 MOORFIELDS w  LONDON  w  EC2Y 9AE
 S O L I C I T O R S      Tel: +44(0) 20 7330 8000 w Fax:
+44(0) 20 7256 6778  w  Web: www.m-f-b.co.uk
----------------------------------------------------------


----------------------------------------------------------

**From:**    "Mark Seward" <MSeward@m-f-b.co.uk>
**To:**    "Bunker Holdings / Y.Kharchenko" <bunkerholdings@transbunker.com>
**Date:**    6/17/2008 7:38:38 AM
**Subject:**    JIN XING

date:

17 June 2008

MS/SKU/0059/283608to:

Bunker Holdings - bunkerholdings@transbunker.com

ref/att:

Yuriy Kharchneko

our ref:

MS/SKU/0059/282461

MATTER:

JIN XING

Dear Yuriy

I refer to our previous exchanges.  Regrettably the vessel failed to land
the sample at Rio Grande and we are endeavouring to have the samples removed
from the vessel at Cape Town instead where it is understood the vessel will
be calling imminently.

On a more pressing note, Owners have sought security from Aquavita in the
sum of US$3.66 million.  While we hope this claim can be defended the fact
of the matter is that in the interim period our clients require
counter-security from you.  Can you confirm please that you will post this?

Kind regards
Mark Seward
Partner
Direct +44 20 7330 8006
Mobile +44 7971 049333

**From:**        "Mark Seward" <MSeward@m-f-b.co.uk>
**To:**          <bunkerholdings@transbunker.com>
**Date:**        5/16/2008 10:05:11 AM
**Subject:**     Re: JIN XING - CONTRACT DATES 2 APRIL 2008

Thanks

Will take up with owners the required tests and revert Monday

May I take it that you have no interest in assisting the debunkering?

Mark Seward
Partner
MFB Solicitors

TEL +44 207 330 8000
MOB +44 7971 049333
DDI +44 207 330 8006

----- Original Message -----
From: Bunker Holdings / Y.Kharchenko <bunkerholdings38@transbunker.com>
To: Mark Seward
Sent: Fri May 16 14:52:17 2008
Subject: RE: JIN XING - CONTRACT DATES 2 APRIL 2008

Dear Mark,

please find attached relevant documents - Sample Receipt, Digital pictures of representative sample
No.17792029 and full Analysis Report.

We would like to point out that DNV can not be considered appropriate laboratory since DNV represents
the interests of shipowners(this is well known) and can not be considered independent.
Saybolt laboratory is acceptable for testing one of two remained representative samples (No. 17792004
in our possession and No. 17792047 retained on the vessel).
Digital pictures of the sample No. 17792004 are also in attachment.


Best regards,
Yuriy Kharchenko

Bunker Holdings Ltd.
Limassol, Cyprus

Tel: +357 25 859738
Fax: +357 25 353595
Mob: +357 99 418976
E-mail: bunkerholdings@transbunker.com



>>> "Mark Seward" <MSeward@m-f-b.co.uk> 16.5.2008 10:00 >>>

Yuriy

I am still missing your report, your confirmation that you will indemnify  Aquavita should the testing of the jointly agreed sample prove off specification and of course your comments on debunkering

Kind regards
Mark Seward
Partner
Direct +44 20 7330 8006
Mobile +44 7971 049333


-----Original Message-----
From: Bunker Holdings / Y.Kharchenko
[mailto:bunkerholdings38@transbunker.com]
Sent: 14 May 2008 13:29
To: Mark Seward
Subject: Re: JIN XING - CONTRACT DATES 2 APRIL 2008

Dear Mark,

yours received, noted.
We will revert with full SGS (not Saybolt) analysis report shortly.

Best regards,
Yuriy Kharchenko

Bunker Holdings Ltd.
Limassol, Cyprus

Tel: +357 25 859738
Fax: +357 25 353595
Mob: +357 99 418976
E-mail: bunkerholdings@transbunker.com


>>> "Mark Seward" <MSeward@m-f-b.co.uk> 13.5.2008 17:24 >>>
date:

13 May 2008

to:

Yuriy Kharchenko - bunkerholdings@transbunker.com




our ref:

MS/SKU/0059/280680MS

MATTER:

MV JIN XING/AQUAVITA - CONTRACT DATED 2 APRIL 2008

Dear Sirs

We are London Solicitors instructed on behalf of disponent Owners of Jin Xing, Aquavita International SA who in turn were buyers of your product supplied under your contract, with Aquavita, dated 2 April

As our clients will have advised you, the Jin Xing arrived at Dakar having experienced serious problems to all of her injectors and pumps (on the main engine and two diesel generators) on 30 April and she remains at Dakar now awaiting spare parts. The Owners have alleged that damage has been sustained by the burning of the bunker supplied by you at Illevchysk. Of course, we are investigating this issue but the damage sustained by the pumps and injectors is consistent with it having burned bunkers of excessive TSP.

New bunkers have now been supplied by the vessel's present Charterers but Owners steadfastly refuse to burn the bunkers supplied by you. In mitigation of their losses, our clients as buyers are taking steps to arrange for them to be debunkered at the vessel's next port of call, Rio Grande. It is not practical to debunker in Dakar. Of course, to the extent there are any losses, our clients will look to you and in the event that you wish to assist in the debunkering operations, please advise failing which our clients will seek to obtain the best possible price from Petrobras for these bunkers. They will also endeavour to ensure that the debunkering operation does not in any way delay the vessel.

You have previously indicated that you consider the bunkers to be on specification and we are of course aware of the mechanism for the analysis of samples contained in your Terms & Conditions as amended by Aquavita's Order of 2 April; we are discussing with our retained chemical engineer and with Owners which samples should be analysed, where, when and for what. We shall be in touch shortly in that respect but in the meantime we are considering on behalf of our clients either Saybolt Rotterdam or DNV in Fujairah as the appropriate lab for analysis. We should be grateful for your confirmation that one or other of those labs will be acceptable and we can take the matter up with Owners.

We shall be in touch but in the meantime please advise when we may see a copy of the full Saybolt Odessa analysis report. Presently our clients have only been shown a copy of the accelerated Cetane TSP test results. Alternatively, in light of the other off spec supplies you have made during the same period you could just accept liability.

We look forward to hearing from you and trust we can rely upon your co-operation to deal with Owners as necessary.

Kind regards

Kind regards
Mark Seward
Partner
Direct +44 20 7330 8006
Mobile +44 7971 049333
-------------------------------------------------------

   M   F   B     45 MOORFIELDS  w  LONDON  w  EC2Y 9AE
   S O L I C I T O R S     Tel: +44(0) 20 7330 8000  w
Fax: +44(0) 20 7256 6778  w  Web: www.m-f-b.co.uk
-------------------------------------------------------

-------------------------------------------------------

This message (and any associated files) is intended only for the
use of the individual or entity to which it is addressed and may
contain information that is confidential.  If you are not the intended
recipient
or if you have received this message in error, please notify us
immediately at
postmaster@m-f-b.co.uk and delete it from your computer.

Internet communications cannot be guaranteed to be secure or error-free
as information could be intercepted, corrupted, lost, destroyed, arrive
late or incomplete, or contain viruses. Therefore, we do not accept
responsibility for any errors or omissions that are present in this
message, or any attachment, that have arisen as a result of e-mail
transmission.

_____
This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email
_____

_____
This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email
_____

-------------------------------------------------------

This message (and any associated files) is intended only for the
use of the individual or entity to which it is addressed and may
contain information that is confidential.  If you are not the intended recipient
or if you have received this message in error, please notify us immediately at
postmaster@m-f-b.co.uk and delete it from your computer.



# TRANSBUNKER GROUP

**Bunker Holdings Ltd.**
IBIA Member

4th floor, Vashiotis Business Centre
156, 28th October & Iakovou Tompazi, Limassol 3107, Cyprus
Tel. (+357) 25 859 999, Fax. (+357) 25 353 595
E-mail: bunkerholdings@transbunker.com   www.transbunker.com

INVOICE No: **1163/04-2008**                    DATE:   **15/04/2008**

To Master and/or Owner and/or Managing Owners and/or Operators and/or Charterers of

MV   **Jin Xing**

A/C   **AQUAVITA INTERNATIONAL S.A.**

C/O   **AQUAVITA INTERNATIONAL S.A.**

   **37, LEOF. KARAMANLI,**

   **VOULA, ATHENS**

   **166 73 GREECE**


VESSEL          : **Jin Xing**                    DUE BY: **22/04/2008**

PORT            : **Yuzhniy**

DELIVERY DATE   : **15/04/2008**

| Description | Quantity | Unit | Unit price | Amount, USD |
|---|---|---|---|---|
| IFO 180 cst | 730.0000 | MT | 518.00 | 378,140.00 |
| | | | | **378,140.00** |

Please remit the above amount as follows:

| | |
|---|---|
| Beneficiary bank : | CommerzBank AG, Germany |
| SWIFT: | COBADEFF |
| IBAN: | DE13100400000208073700 |
| Account No: | 100 2080737 USD |
| **Beneficiary:** | **BUNKER HOLDINGS LTD** |
| Intermediary Bank: | Commerzbank AG, New York Branch |
| Interm. Bank SWIFT: | COBAUS3X |

NOTES: *      Please quote the above invoice number as reference of payment.
   **        Bank charges to be on remitter's account

AUTHORIZED SIGNATURE



**TRANSBUNKER GROUP**
Bunker Holdings Ltd.
IBIA Member

4th Floor, Vashiotis Business Center
156, 28th October & Iakovou Tompazi, Limassol, 3107, Cyprus
Tel: (+357) 25 859 740 Fax: (+357) 25 353 595
Email: bunkerholdings@transbunker.com  www.transbunker.com

BDR No.  96

# BUNKER DELIVERY RECEIPT

| | | | |
|---|---|---|---|
| Port of delivery | Yuzhny | Vessel's Name | «Jin Xing» |
| Delivered by (Barge name) | « Krilyon » | IMO Number | |
| Alongside vessel (Date/Time) | 15.04.08 / 02.10 | Owner/Operat. | |
| Pumping started (Date/Time) | 15.04.08 / 03.45 | Next Port | |
| Pumping finished (Date/Time) | 15.04.08 / 09.30 | ETD | |

## PRODUCT SUPPLIED    IFO

Grade

| | | | |
|---|---|---|---|
| Viscosity, cSt at $50^0$C | 131.5 | Sulphur, % | 2,25 |
| Density, at $15^0$C, kg /m$^3$ | 0,9554 | Water, % | 0.5 |
| Flash Point, $^0$C | +166 | Tank temperature,$^0$C | +35 |
| Pour Point, $^0$C | | | |

### Delivered quantity

| Volume, m3 | 773.2 | Weight, mt | 730.0 |
|---|---|---|---|

Note: ABOVE MENTIONED GOODS ARE SOLD ACCORDING TO THE GENERAL TERMS AND CONDITIONS OF BUNKER HOLDINGS LTD
The fuel oil supplied is in conformity with regulation 14 (1) and 18/1 of Marpol Annex VI Regulation

| SUPPLIER'S CONFIRMATION | MASTER/CHIEF ENGINEER'S ACKNOWLEDGEMENT |
|---|---|
| We confirm that the above product was delivered and that the quantities were correct | We acknowledge receipt of the above product and confirm that samples were taken, sealed and numbered as follows. |

Nº of sample for bunkering barqe:  17792004
Nº of sample for vessel receivingbunker:  17792047
Nº of sample for MARPOL 73/78:  17792063



Acknowledged by

On behalf of  Bunker Holdings

M.V. "JIN XING"

Signature of Master/Chief Engineer

Chief Engineer

Full Name in Block Capitals

Receiving vessel's stamp

>>> "Mark Seward" <MSeward@m-f-b.co.uk> 9.7.2008 15:21 >>>
This is the claim against us

quote

1.    Hire loss: US$1,411,041.00

The current sub-charterers, Korea Line put the Vessel off hired staring
from 1230 GMT on 30 April (deviated to Dakar) till 0055 GMT on 24 May
(back to an equidistance point as the deviating point) totalling
23.51736 days and the daily hire is US$60,000. As a matter of fact,
your clients have been sent position reports by the Master of the Vessel.

 2.    Bunker consumption during off hire period: US$73,758.00

IFO 83mt x 570pmt = 47,310.00; MDO 22.04mt x 1200 pmt = 26,448.00

3.    Bunker cost at Dakar: US$355,300.00

550mt x 646pmt = 355,300.

 4.    Port disbursemenet at Dakar: US$30,000 (estimated and the agent
has been asked to provide invoice)

 5.    Cost of bunkering at S. Africa and loss of hire: US$100,000.00
(estimated)

Deviation to Cape Town about 0.5 day: US$30,000; bunkering operation
at
Cape Town about 1 day: US$60,000; PDA at Cape Town about US$10,000

 6.    Bunker consumption for calling at S. Africa: US$12,699.00
(estimated)

IFO 33.6mt x 570pmt x 0.5 day = 9,576.00; IFO 1.9mt x 570pmt x 1 day =
1,083.00; MDO 1.7mt x 1,200pmt x 1 day = 2,040.00

7.    Port disbursement at S. Africa: US$10,000 (estimated)

8.    Loss of hire for debunkering at Singapore: US$120,000.00
(estimated)

2 days x 60,000 = 120,000.00 (please note the debunkering is to be
carried out by your clients)

9.    Bunker consumption during debunkering at Singapore: US$6,246.00
(estimated)

IFO 1.9mt x 2 days x 570pmt = 2,166.00; MDO 1.7mt x 2 days x 1,200pmt
=
4,080.00

10. Main engine spare parts: US$60,000 (your figure)

11. Hire loss for adding up off hire period by Korea Line:
US$470,347.20
(estimated)

Korea Line declared that they want to add the off hire period to the
charter period but as you may agree that my clients are not in a
similar positon towards the head owners and they will therefore have to

charter in a similar tonnage for this purpose, the current market is about US$80,000, the difference is US$20,000 x 23.51736 days = 470,347.20.

12. Sub-charterers' deadfreight claim: US$60,000 (estimated)

Korea Line claimed deadfreight for 500mt due to the Vessel being unable to load a full cargo at Rio Grande, Brazil, the current market freight is US$120pmt x 500 = 60,000

13. Various survey costs and lab test cost: US$10,000.00 (estimated)

 The total amount of the above is US$2,719,391.20. We have yet added interest and legal costs which would be approximately US$800,000 for a period of four years.

Kind regards
Mark Seward
Partner
Direct +44 20 7330 8006
Mobile +44 7971 049333
-----------------------------------------------------

  M   F   B    45 MOORFIELDS  w  LONDON  w  EC2Y 9AE
 S O L I C I T O R S    Tel: +44(0) 20 7330 8000  w
Fax: +44(0) 20 7256 6778  w  Web: www.m-f-b.co.uk
-----------------------------------------------------